UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE  DIVISION

MARK McMANAWAY; DAVID                      )
RANCOURT; BRENT LASHER; JODY               )
AISTROP; WILLIAM EARL BICKELL;             )
MATTHEW DALE BOARD; LARRY                  )
BUNNER; WILLIAM DeLASHMUTT;                )
JEFFREY FROMME; JEFFERY HENKE;             )
ANTHONY HUFF; BEN McINTYRE;                )
JEFFREY ALAN VARNER; TOMMY J.              )
EBERT, JR.; LUCAS RAY WHISTLE;             )
MICAH PARTLOW; JURGEN P.                   )
TURNER, JR.; RUSSELL KIMBERLING;           )
SCOTT WYATT; GARY FISCHL;                  )
STEPHEN SALAMONE; RUSSELL                  )
GARVIN; DANIEL KRIBS; DAVID                )
BARKER; EDWARD BOSA; STEVE                 )
MOORE on behalf of the wrongful death      )
estate of DAVID MOORE; JASON               )
BREEDEN; CLINTON HAMMACK; SAM              )
SCHULTZ; BRENDAN WILCZYNSKI;               )
DAVID ANGELL; BRENNIN                      )
SHEPHERD; RYAN LEVITZ; WILLIAM             )
MICHAELS; ERIC FLORES; JEROLD              )
EVRARD; TIM THOMPSON;                      )
JONATHAN ROBERTSON; JESSE                  )
HARDIN; CLAY CHAMPION; RONALD              )
WILSON; GEORGE DEEL; JAMES                 )
GENTRY; FRED LUMPKIN; TERRY                )
MILLER; RALPH STILES; and BRIAN            )
WANINGER,                                  )
                Plaintiffs,                )
                                           )          3:08-cv-186-RLY-WGH
        vs.                                )
                                           )
KBR, INC.; KELLOGG, BROWN & ROOT           )
SERVICES INC.; KBR TECHNICAL               )
SERVICES, INC.; OVERSEAS                   )
ADMINISTRATIVE SERVICES, LTD.;             )

1

and SERVICE EMPLOYEES                    )
INTERNATIONAL. INC.,                      )
             Defendants.                    )

## ENTRY ON DEFENDANTS' MOTION TO DISMISS
## FOR LACK OF PERSONAL JURISDICTION

This action is brought by forty-seven members of the Indiana National Guard ("Plaintiffs") against KBR, Inc. ("KBR"), Kellogg, Brown & Root Services, Inc. ("Kellogg"), KBR Technical Services, Inc. ("KBR Technical"), Overseas Administration Services, Ltd. ("OAS"), and Service Employees International Inc. ("SEII") (collectively "Defendants"). During their deployment in the summer of 2003, Plaintiffs provided security for Defendants and their employees as they worked to restore the Qarmat Ali water treatment facility in southern Iraq.  Plaintiffs allege that the Qarmat Ali site was contaminated with sodium dichromate, a toxic chemical containing nearly pure hexavalent chromium.  Plaintiffs claim that Defendants knew of the presence of sodium dichromate and failed to alert Plaintiffs, causing them injury and exposing them to a substantially heightened risk of cancer and other life-threatening illnesses.

Although Defendants deny Plaintiffs' allegations, that denial is not the basis for the instant motion.  Rather, Defendants move the court to dismiss Plaintiffs' Third Amended Complaint for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2).  For the reasons set forth below, Defendants' motion must be **GRANTED**.  Defendants' two previously filed motions to dismiss for lack of personal jurisdiction (based on Plaintiffs' Original Complaint and Second Amended Complaint)

2

are **DENIED AS MOOT**.

## I.      Motion to Dismiss Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a court is required to dismiss an action for lack of personal jurisdiction.  A plaintiff's complaint need not include facts alleging personal jurisdiction.  *Steel Warehouse of Wisconsin, Inc. v. Leach*, 154 F.3d 712, 715 (7th Cir. 1998) (citing *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987)). However, once a defendant raises lack of personal jurisdiction as a defense, the plaintiff bears the burden of showing that jurisdiction is proper.  *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (citations omitted).  The precise nature of the plaintiff's burden depends on whether the court's ruling is based on an evidentiary hearing or the submission of written materials.  *Id.*

In the instant case, the court relies entirely on the submission of written materials. Accordingly, Plaintiffs "need only make out a *prima facie* case of personal jurisdiction." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002).  In evaluating whether the prima facie standard has been satisfied, the court accepts the uncontroverted allegations in Plaintiffs' Complaint as true and resolves any factual disputes regarding relevant facts in Plaintiffs' favor.  *Purdue*, 338 F.3d at 782; *see also John Walker & Sons, Ltd. v. DeMert & Dougherty, Inc.*, 821 F.2d 399, 402 (7th Cir. 1987).

## II.     Facts

The court accepts the following facts as true for purposes of the present motion. Any factual disputes between the parties have been resolved in favor of Plaintiffs.

3

### A.    Qarmat Ali

The events giving rise to this action took place in southern Iraq.  As part of Project Restore Iraqi Oil ("Project RIO"), Defendants were contracted by the United States government to repair the water facility treatment plant at Qarmat Ali, so that the facility could once again be used to inject water into oil wells and help resume Iraqi oil production.  (Third Amended Complaint ("Complaint") ¶ 1.1).  Plaintiffs, members of the Indiana National Guard who had been deployed to Iraq, were assigned to protect Defendants' employees from insurgents.  (*Id.* ¶ 1.2).  Herb Meyers, KBR's Project Manager for Project RIO, and Leon Cater, KBR Superintendent, both knew that Plaintiffs were from Indiana.  (Affidavit of John Ezell ("Ezell Aff.") ¶¶ 13, 14).

Defendants' employees interacted frequently with Plaintiffs while working at Qarmat Ali.  (*See, e.g., id.* ¶ 4).  In addition to these informal interactions, Defendants' employees were included in pre-mission meetings wherein special needs and concerns were raised.  (James Gentry Deposition ("Gentry Dep.") at 61-62).  To the extent that any individual in a patrol would have had knowledge concerning harmful chemicals, it would have been incumbent on that individual, as part of the overall mission, to share that information.  (*Id.*).  Defendants' employees were also expected to inform Plaintiffs of known dangers in each morning's "battle update brief."  (*Id.* at 63).

While at Qarmat Ali, Plaintiffs were exposed to sodium dichromate, a toxic chemical used at the facility as an anti-corrosive and containing nearly pure hexavalent chromium.  (Complaint ¶ 1.2).  Hexavalent chromium is one of the most potent

4

carcinogens and mutagenic substances known to man and can enter the human body by inhalation, ingestion, and absorption through the skin.  (*Id.* ¶ 4.9).  Humans exposed to hexavalent chromium often exhibit nasal bleeding, known as "chrome nose."  (*Id.*). Hexavalent chromium can cause severe damage to the liver and kidneys, depress the immune system, and create a heightened risk of cancer.  (*Id.*).

Defendants were aware of the presence of sodium dichromate at Qarmat Ali in April of 2003, long before Plaintiffs ever arrived at the facility.  (*Id.* ¶ 4.2).  Once Plaintiffs did arrive at Qarmat Ali and began experiencing "chrome nose," Defendants' managers told them that it was simply an effect of the "dry desert air" and that they must be "allergic to sand."  (*Id.* ¶ 1.2).  Plaintiffs were repeatedly told that there was no danger at Qarmat Ali, even after Defendants knew that blood testing of American civilians at Qarmat Ali confirmed elevated chromium levels.  (*Id.*).

As documented by KBR managers, sixty percent of the workers at Qarmat Ali reported symptoms of acute poisoning by the beginning of August 2003.  (*Id.* ¶ 4.3).  In August 2003, KBR managers conducted an inspection of Qarmat Ali in full "Level C" environmental protection gear, including suits protecting against even skin exposure. (*Id.*).  Protective gear was not provided to Plaintiffs.  (*Id.*).  Work was stopped at Qarmat Ali in September 2003.  (*Id.* ¶ 4.3).

**B.      Defendants' Contacts with the State of Indiana**

**1.      KBR**

KBR is a corporation formed under the laws of the State of Delaware and its principal place of business is in Houston, Texas.  KBR was formed in 2006 as part of the spin-off of KBR from Halliburton Company.  KBR is the ultimate parent of Kellogg, KBR Technical, OAS, and SEII.  (Affidavit of Mark Lowes ("Lowes Aff.") ¶ 6).  As an individual company, KBR has no employees and does not provide or market any services.  (KBR's Answers to Interrogatories ¶ 6, 14).  KBR is not registered to do business in Indiana, maintains no offices or other facilities in Indiana, and does not have bank accounts in Indiana.  (Lowes Aff. ¶ 7).

**2.      Kellogg**

Kellogg was formed under the laws of the State of Delaware and maintains its principal place of business in Houston, Texas.  Kellogg is the operating company and contracting entity for KBR's Government & Infrastructure business unit, which is an engineering, construction, and services contractor for public sector and private clients worldwide.  (*Id.* ¶ 8).  This is the entity that held the government contract underlying Defendants' work at Qarmat Ali and giving rise to this litigation.  (Lowes Dep. at 11, 71).  Kellogg management directed the activities at Qarmat Ali, whereas KBR Technical, OAS, and SEII provided employees necessary to complete Project RIO.  (*Id.* at 25).

Kellogg registered to do business in Indiana on April 4, 2003, and has maintained its Certificate of Authority since that date.  (Lowes Aff. ¶ 9).  Kellogg held a contract

6

with the United States Army Corp of Engineers based out of Louisville, Kentucky from approximately 1998 to November 2003, which was a job order contract for maintenance and repair work at Grissom Air Force Base (located in Indiana) and a limited number of other sites in Indiana. (*Id.* ¶ 9). Although it is not certain, Kellogg believes it may have hired local labor to help execute this contract. (Lowes Dep. at 56). Kellogg held a second contract with the United States Army to provide training at Camp Atterbury in southern Indiana. In connection with this contract, a Kellogg employee was at Camp Atterbury for ten days in 2008. A second employee visited Camp Atterbury in January of 2009. Kellogg does not know if the Camp Atterbury contract is still in place. (*Id.* at 50-52).

In the past six years, Kellogg has directed payment to approximately fifty Indiana business entities. (Kellogg's Answers to Interrogatories ¶ 3). Kellogg does not maintain offices or other facilities in Indiana and does not have bank accounts in Indiana. Kellogg has no direct employees. (Lowes Aff. ¶ 10).

### 3. KBR Technical

KBR Technical is a payroll company that provides payroll services to the majority of KBR-related company employees in the United States. (*Id.* ¶ 12). It was formed under the laws of the State of Texas and maintains its principal place of business in Houston, Texas. (*Id.* ¶ 11). KBR Technical's predecessors in interest registered to do business in Indiana on August 17, 1992, and KBR Technical has maintained this Certificate of Authority. (*Id.* ¶ 12). KBR Technical does not maintain offices, facilities, or bank

7

accounts in Indiana. (*Id.* ¶ 16). KBR Technical has procured materials from vendors who list Indiana as their residence. (Lowes Dep. at 64).

Since its inception in 1989, KBR Technical has employed approximately 34 individuals who provided residential addresses in Indiana. (Lowes Aff. ¶ 17). With the exception of the following, these employees work exclusively on projects outside of Indiana. (*Id.* ¶ 17). A KBR Technical employee visited Camp Atterbury in southern Indiana for approximately ten days in 2008 to participate in an Army training exercise pursuant to a task order under the USA Europe Support operations contract between the United States Army and Kellogg. A different KBR Technical employee visited Camp Atterbury in January 2009 to participate in the same training exercises pursuant to the same contract. (*Id.* ¶ 13). In addition, a single KBR Technical employee performed work on behalf of Kellogg on the job order contract primarily at Grissom Air Force Base from approximately 1998 through 2003. (*Id.* ¶ 14). In 2007, a KBR Technical employee attended a career fair at Purdue University in Indiana for recruitment purposes. (Lowes Dep. at 26, 29).

### 4.    OAS and SEII

OAS and SEII provide employees for the execution of Kellogg-related contracts. (Lowes Dep. at 12). OAS and SEII were formed under the laws of the Cayman Islands and maintain their principal places of business in Dubai, United Arab Emirates. (Lowes Aff. ¶ 18, 21). Neither OAS nor SEII maintains offices or facilities in Indiana, nor are they registered to do business in Indiana. (*Id.* ¶ 19, 22). Since their inceptions, OAS has

employed approximately 19 individuals who provided residential addresses in Indiana, and SEII has employed about 441 such individuals. (*Id.* ¶ 20, 23). These employees work exclusively on projects outside of the United States. (*Id.*). OAS and SEII use a website, accessible to Indiana residents, to recruit employees. (Lowes Dep. at 27).

## III.    Discussion

"A district court sitting in diversity has personal jurisdiction over a nonresident defendant only if a court of the state in which it sits would have jurisdiction." *Purdue*, 338 F.3d at 779. This determination would usually require the court to engage in a two-step analysis. *Id.* (citing *Int'l Med. Group, Inc. v. Am. Arbitration Ass'n, Inc.*, 312 F.3d 883, 846 (7th Cir. 2002)). First, the court would determine whether the nonresident falls within the reach of the state's long-arm statute; second, the court would determine whether the exercise of personal jurisdiction over the nonresident comports with federal constitutional due process. *Id.* However, as Indiana's long-arm statute, Indiana Rule of Trial Procedure 4.4(a), expands personal jurisdiction to the full extent permitted by the Due Process Clause, *LinkAmerica Corp. v. Albert*, 857 N.E.2d 961, 966-67 (Ind. 2006), the sole inquiry before the court is whether exercising personal jurisdiction over Defendants would offend due process.

The Due Process Clause of the Fourteenth Amendment limits when a court may assert personal jurisdiction over nonresident defendants. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997). A nonresident defendant must "have certain minimum contacts with the [forum state] such that the maintenance of the suit does not

offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The crucial inquiry is whether a defendant's contacts with the forum state are such that it should reasonably anticipate being haled into court there. *Int'l Med. Group*, 312 F.3d at 846 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *Central States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000)). "This . . . ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts . . . ." *Burger King*, 471 U.S. at 475 (citations omitted).

What the "minimum contacts" standard means in a particular case depends on whether "general" or "specific" jurisdiction is asserted. *RAR*, 107 F.3d at 1277. General jurisdiction over a defendant exists where the defendant has continuous and systemic business contacts with the state, even where those contacts do not relate to the action at issue. *See Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984) (discussing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952)). Specific jurisdiction, on the other hand, "exists for controversies that arise out of or are related to the defendant's forum contacts." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002) (citing *Steel Warehouse of Wisconsin, Inc. v. Leach*, 154 F.3d 712, 714 (7th Cir. 1998)). The court addresses both general and specific jurisdiction in turn below.

### A.    Specific Jurisdiction

Plaintiffs argue that Defendants can be subject to specific personal jurisdiction in

this court based on the "effects test," first articulated by the United States Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984).  In *Calder*, the plaintiff, a California resident, brought an action in a California court against two *National Enquirer* employees for their involvement with an allegedly libelous article written about plaintiff.  The defendants, both residents of Florida, challenged personal jurisdiction in the California court.  Although the article was written in Florida, "the brunt of the harm, in terms both of [plaintiff's] emotional distress and the injury to her professional reputation, was suffered in California."  *Id.* at 788-89.  The Supreme Court held that personal jurisdiction over the defendants was proper in California based on the "effects" of their Florida conduct in California.  *Id.* at 789.  In its analysis, the Court specifically noted that the defendants were "not charged with mere untargeted negligence," but rather with undertaking intentional, and allegedly tortious, actions "expressly aimed at California."  *Id.*  Under these circumstances, the Court concluded that defendants "must 'reasonably anticipate being haled into court there' to answer for the truth of the statements made in their article."  *Id.* at 790 (citations omitted).

The Seventh Circuit interprets the effects test broadly.  *See, e.g., Janmark, Inc. v. Reidy*, 132 F.3d 1200 (7th Cir. 1997); *Indianapolis Colts, Inc. v. Metro Baltimore Football Club*, 34 F.3d 410 (7th Cir. 1994); *see also Lincoln Diagnostics, Inc. v. Panatrex, Inc.*, 2008 WL 2246960, at *12 (C.D. Ill. May 29, 2008) ("The Seventh Circuit has interpreted the effects doctrine broadly.").  In *Indianapolis Colts*, the Indianapolis Colts (formerly the Baltimore Colts) and the National Football League brought suit in an

Indiana federal court for trademark infringement against the Canadian Football League and its new Baltimore team, which wanted to call itself the "Baltimore CFL Colts." 34 F.3d at 410. The defendants challenged personal jurisdiction, as their only activity in Indiana was the national televising of their games. *Id.* However, the court found that because the bulk of the Indianapolis Colts' most loyal fans reside in Indiana, the defendants knew that the largest concentration of consumers likely to be confused by the implicit affiliation would be in Indiana. *Id.* at 411. In holding jurisdiction to be proper, the Court explained that "[s]ince there can be no tort without an injury, the state in which the injury occurs is the state in which the tort occurs, and someone who commits a tort in Indiana should, one might suppose, be amenable to suit there." *Id.* at 411-12 (internal citation omitted).

Similarly, in *Janmark*, the Seventh Circuit found jurisdiction in an Illinois federal court to be proper because the injury and, thus, the tort occurred in Illinois. 132 F.3d at 1202-03. In that case, the plaintiff, a mini shopping cart seller, asserted that the defendant, a business competitor located in California, intentionally interfered with its prospective economic advantage by making false claims of copyright infringement to a customer located in New Jersey. *Id.* at 1202. In reaching its holding, the Court noted that "the location of the injury . . . is vital to understanding where the tort occurred." *Id.* Personal jurisdiction in Illinois comported with due process because the tort at issue was not complete (because no injury occurred) until the plaintiff's customer called Illinois to cancel his order. *Id.* Moreover, the Court stated, "there can be no serious doubt after

*Calder v. Jones* that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor."  *Id.*

As demonstrated by the cases above, the effects test allows a court to exert personal jurisdiction over a defendant if they: (i) commit intentionally tortious actions; (ii) which are expressly aimed at the forum state; (iii) which cause harm to the plaintiff in the forum state, of which the defendant knows is likely to be suffered.  *See Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 835 (N.D. Ill. 2000) (citing *Calder*, 465 U.S. 783).  The court now examines whether these three requirements are met by the present case.

### 1.    "Intentionally Tortious Actions"

In their briefs, the parties disagree as to what constitutes "intentionally tortious actions."  Defendants argue that a plaintiff must plead an intentional tort in order to satisfy this prong of the effects test, while Plaintiffs argue that alleging conduct sufficient to sustain an intentional tort is sufficient.  The court need not resolve this dispute, as Plaintiffs' Third Amended Complaint does include claims for fraud and intentional infliction of emotional distress.

### 2.    "Expressly Aimed at the Forum State"

A plaintiff may not "hale any defendant into court in the plaintiff's home state, where the defendant has no contacts, merely by asserting that the defendant has committed an intentional tort against the plaintiff."  *Wallace v. Herron*, 778 F.2d 391, 394 (7th Cir. 1985) (discussing *Calder*, 465 U.S. at 783).  Rather, the defendant's alleged

tortious conduct must be "directly targeted at a particular jurisdiction." *Nerds on Call, Inc. (Ind.) v. Nerds on Call, Inc. (Cali.)*, 598 F. Supp. 2d 913, 919 (S.D. Ind. 2008).  In the instant case, Plaintiffs argue that Defendants' tortious actions were expressly aimed at Indiana because Defendants knew that after being exposed to sodium dichromate at Qarmat Ali, Plaintiffs would then return to Indiana, where they would subsequently experience health problems, such as cancer and kidney damage.  (*See* Plaintiffs' Surreply at 7).  This argument is simply too tenuous to support a finding that Defendants expressly targeted the State of Indiana.

The court finds two problems with Plaintiffs' argument.  First, while Plaintiffs have presented evidence that Defendants knew Plaintiffs were from Indiana, Plaintiffs have not established that Defendants knew Plaintiffs intended to return to Indiana after leaving Iraq.  In fact, several of the Plaintiffs are currently residing in other states.  (*See* Complaint ¶ 2.1).  Second, Plaintiffs allege that Defendants concealed the presence of sodium dichromate at Qarmat Ali to prevent their restoration project from being suspended while the danger was addressed.  (*See* Plaintiffs' Response Brief at 2).  According to this theory, Defendants' alleged tortious conduct was directed at any individuals who visited Qarmat Ali, regardless of their permanent residence.  In fact, Plaintiffs' Complaint notes that there were individuals at Qarmat Ali from other states and countries who were affected from Defendants' "knowing acts and omissions." (Complaint ¶ 1.2).  It appears to the court that Defendants "targeted" any and all individuals passing through Qarmat Ali – that some of those individuals happened to be

14

residents of Indiana was merely fortuitous.

### 3.   "Harm in the Forum State"

Plaintiffs argue that Defendants have caused them "harm" in Indiana because, as a result of their exposure to sodium dichromate at Qarmat Ali, Plaintiffs now have a considerably increased chance of developing cancer and other various health problems. To support their argument, Plaintiffs refer the court to the "ticking time-bomb" hypothetical set forth in *Janmark*.  In *Janmark*, the Court opined that had the defendant intercepted a shipment of the plaintiff's shopping carts in New Jersey, placed a bomb in the shipment and sent it back to Illinois, where the bomb exploded, the tort would occur in Illinois.  132 F.3d at 1202.  Plaintiffs argue that "the likely cancer deriving from [Plaintiffs'] sodium dichromate exposure will manifest itself–in Indiana–not unlike a bomb with an unpredictable fuse."  (Plaintiffs' Response Brief at 18).

The court does not believe Plaintiffs make an apt comparison.  The purpose of the "ticking time-bomb" hypothetical was to demonstrate the difference between the location of an injury (and thus, the tort) and where the effects of that injury are felt.  *See Nerds on Call*, 598 F. Supp. 2d at 919 ("[T]he court in *Janmark* noted specifically that in analyzing injury, the crucial question was analyzing where the injury occurred and not the effect of the injury.").  The Court contrasted the "ticking time-bomb" hypothetical with one in which the defendant intercepted a shipment of the plaintiff's shopping carts in New Jersey and then pushed the shipment into the Atlantic Ocean.  *Janmark*, 132 F.3d at 1202. In this second hypothetical, the court explained that although the economic fall-out from

the loss of shopping carts would be felt by the plaintiff in Illinois, "this would not relocate the tort from New Jersey to Illinois." *Id.*

This case is more accurately compared to the "shopping carts in the Atlantic Ocean" hypothetical. The injury occurred in Iraq, when Plaintiffs were exposed to sodium dichromate at Qarmat Ali. While the effects of that injury may ultimately be felt by Plaintiffs in Indiana (or any other state in which they reside), the tort does not relocate from Iraq to Indiana.

### B.   General Jurisdiction

"[G]eneral jurisdiction allows a defendant to be sued in the forum regardless of the subject matter of the litigation." *Purdue*, 333 F.3d at 787. In practice, the standard for establishing general jurisdiction is fairly high, *Wilson v. Humphreys (Cayman) Ltd.*, 916 F.2d 1239, 1245 (7th Cir. 1990) (quoting *Fields v. Sedgwick Associated Risks Ltd.*, 796 F.2d 299, 201 (9th Cir. 1986)), and is "considerably more stringent" as compared to specific jurisdiction. *Purdue*, 338 F.3d at 787 (quoting *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001)). In order for a court to exercise general jurisdiction over a nonresident defendant, the defendant's contacts with the forum state "must be so extensive to be tantamount to [the defendant] being constructively present in the state to such a degree that it would be fundamentally fair to require [the defendant] to answer in an Indiana court in *any* litigation arising out of *any* transaction or occurrence taking place *anywhere* in the world." *Id.* (emphasis in original).

Several factors are generally considered when determining whether general

jurisdiction can be properly exercised over a defendant, including:

> (1) whether and to what extent the defendant conducts business in the forum state;
> (2) whether the defendant maintains an office or employees within the forum state;
> (3) whether the defendant sends agents into the forum state to conduct business;
> (4) whether the defendant advertises or solicits business in the forum state; and
> (5) whether the defendant has designated an agent for service of process in the forum state.

*Elayyan v. Sol Melia, SA*, 571 F. Supp. 2d 886, 895 (N.D. Ind. 2008) (citations omitted);

*Interlease Aviation Investors II (Aloha) L.L.C. v. Vanguard Airlines, Inc.*, 262 F. Supp. 2d

898, 906-07 (N.D. Ill.  2003) (citations omitted).  Personal jurisdiction must be assessed

separately as to each defendant.  *Rush v. Savchuk*, 444 U.S. 320, 332 (1980).

Accordingly, the court considers each of the Defendants' contacts with the State of

Indiana below.

### 1.    Kellogg

Kellogg is registered to do business in Indiana and has appointed an agent for

purposes of service of process.  Plaintiffs direct the court to a case from the Southern

District of New York in which the district court held that registering to do business in

New York was sufficient to support a finding of personal jurisdiction.  *Mije Assoc. v.*

*Halliburton Serv.*, 552 F. Supp. 418, 419 (S.D.N.Y. 1982).  The court declines to give this

holding any weight, as it directly contradicts Seventh Circuit precedent, which is binding

on the court.  *See Wilson*, 916 F.2d at 1245 (The act of registering to do business in a state

"cannot satisfy . . . standing along . . . the demands of due process.").

Kellogg's other contacts with Indiana include a job contract for maintenance and repair work at Grissom Air Force Base that ended in 2003, a contract to provide training at Camp Atterbury in 2008 and 2009, and directing payment to various Indiana businesses.  These contacts are not of the quality or quantity necessary to enable the court to exercise general jurisdiction over Kellogg.

### 2.    OAS and SEII

The only contact OAS and SEII have with Indiana is that a small percentage of their employees over the years have resided in Indiana.  However, these employees conduct no business for OAS and SEII in Indiana, but rather work exclusively on projects outside of the United States.  The fact that some OAS and SEII employees choose to live in Indiana is merely fortuitous.

In their brief, Plaintiffs assert that "it is probable that several employees were recruited in Indiana by way of Defendants' recruiting website."  (Plaintiffs' Response Brief at 20).  Courts typically use a sliding scale analysis to ascertain what level of Internet interaction subjects a defendant to personal jurisdiction.  *Euromarket Designs*, 96 F. Supp. 2d at 837.  The analysis consists of three levels: (1) where the defendant conducts business over the Internet through its active website; (2) where the defendant maintains an interactive website; and (3) where the defendant maintains a passive website.  *Id.* at 837-38.  The court cannot determine where on the sliding scale the website at issue falls because Plaintiffs present no evidence beyond asserting that the

Defendants have a recruiting  website.  Accordingly, Plaintiffs cannot rely on these websites to meet their burden of proving that OAS and SEII are subject to general jurisdiction in this court.

### 3.    KBR Technical

Of the five Defendants, KBR Technical has had the most contacts with Indiana. KBR Technical is registered to do business in Indiana, it had an employee who worked at Grissom Air Force Base from 1998 to 2003, it sent an employee to Camp Atterbury for one to two weeks in 2008 and 2009 to conduct training sessions, it sent an employee to a career fair at Purdue University in 2007, and it has employed approximately 34 Indiana residents.  However, even viewed collectively, these contacts cannot be said to be "continuous and systematic."

### 4.    KBR

Plaintiffs do not dispute that KBR lacks any direct contacts with the State of Indiana.  Rather, Plaintiffs argue that the contacts of the four other Defendants should be imputed to KBR due to the parent-subsidiary relationship.  "Traditionally, courts presume that a parent and a subsidiary are institutionally independent when determining whether a subsidiary's contacts with the forum may justify assertion of personal jurisdiction over the parent."  *Wesleyan Pension Fund, Inc. v. First Albany Corp.*, 964 F. Supp. 1255, 1261 (S.D. Ind. 1997) (citing *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336 (1925)).  This presumption may only be overcome by "clear evidence" that the parent utilized the subsidiary as an agent, exercised greater control over the subsidiary than

19

normal, or operated the subsidiary as an empty shell.  *Id.* at 1261-62.

Plaintiffs do not offer any such evidence.  Rather, they argue in conclusory fashion that "KBR, Inc.'s unique circumstance of having no employees and performing no services necessarily creates an agency relationship between it and its subsidiaries, which allows the [Plaintiffs] to use the actions of KBR, Inc.'s subsidiaries as a predicate for personal jurisdiction."  (Plaintiffs' Response Brief at 19).  This is simply not sufficient to overcome the presumption that KBR is institutionally independent from its subsidiaries.

## IV.    Conclusion

For the reasons set forth above, Plaintiffs have not met their burden of establishing that the court may properly exercise personal jurisdiction over Defendants.  Accordingly, the court has no choice but to **GRANT** Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (Docket # 111).  Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (Docket # 58) and Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (Docket # 102) are **DENIED AS MOOT**.


**SO ORDERED** this 25th day of February 2010.


RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

20

Electronic Copies to:

David J. Cutshaw
COHEN & MALAD LLP
dcutshaw@cohenandmalad.com

Michael Patrick Doyle
DOYLE RAIZNER LLP
mdoyle@doyleraizner.com

Gabriel Adam Hawkins
COHEN & MALAD LLP
ghawkins@cohenandmalad.com

Randall  Jones
SERPE JONES ANDREWS CALLENDER & BELL PLLC
rjones@serpejones.com

Gregory L. Laker
COHEN & MALAD LLP
glaker@cohenandmalad.com

Christopher D. Lee
KAHN DEES DONOVAN & KAHN
clee@k2d2.com

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

Thomas Eugene Mixdorf
ICE MILLER LLP
thomas.mixdorf@icemiller.com

Jeffrey L. Raizner
DOYLE RAIZNER LLP
jraizner@doyleraizner.com

Phillip R. Scaletta
ICE MILLER
scaletta@icemiller.com

Donald M. Snemis
ICE MILLER LLP
donald.snemis@icemiller.com

Seth M. Thomas
ICE MILLER LLP
seth.thomas@icemiller.com

Copies to:

Patrick M Dennis
DOYLE RAIZNER LLP
One Houston Center
1221 McKinney
Suite 4100
Houston, TX 77010

William H. Whitaker
SERPE, JONES, ANDREWS, CALLENDER & BELL, PLLC
Three Allen Center
333 Clay Street, Suite 3485
Houston, TX 77002