# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### EVANSVILLE DIVISION

MARK McMANAWAY, *et al*        §
                              §
        Plaintiffs,           §
                              §
v.                            §        Cause No. 3:08-cv-0186-RLY-WGH
                              §
KBR, INC., *et al,*           §
                              §
        Defendants.           §

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OBJECTION TO DEFENDANTS' BILL OF COSTS AND IN OPPOSITION TO DEFENDANTS' MOTION FOR ATTORNEY'S FEES

Defendants' March 16, 2010 Bill of Costs is neither legally nor factually supportable. Defendants do not have standing to petition for costs because costs may only be awarded to a "prevailing party," and a personal jurisdiction-based dismissal does not render a party "prevailing" for purposes of Rule 54(d)(1) of the Federal Rules of Civil Procedure. Even if Defendants had standing—and they do not—Defendants' attorney billing statements submitted in support of their Motion for Attorney's Fees confirm that Defendants engaged in a pervasive pattern of discovery violations, which also renders Defendants' Bill of Costs improper. Finally, the majority of the expenses underlying Defendants' Bill of Costs are not recoverable pursuant to statute.

Defendants' prayer for attorney's fees is equally deficient and does not present a proper showing necessary for such an award. Defendants proffer the wrong standard to obtain an award of attorney's fees pursuant to 28 U.S.C. section 1927, and Defendants fail to establish that Plaintiffs' conduct merits an award.

Were Plaintiffs' theory of jurisdiction patently unreasonable, this Court would not have provided twenty pages of detailed analysis to support its conclusion that Defendants are not subject to its jurisdiction.  Finally, in addition to failing to meet their burden of demonstrating that Plaintiffs' theory of jurisdiction was frivolous, unreasonable, or groundless pursuant to Indiana Code section 34-52-1-1(b), Defendants fail to make the requisite underlying showing that Indiana law governs this action—having prevailed in their assertion that Indiana does not have a sufficient connection to this dispute to give rise to personal jurisdiction, Defendants' invocation of Indiana law in support of their Motion for Attorney's Fees is more than ironic.

For all of these reasons and those stated below, Plaintiffs pray that this Court sustain Plaintiffs' Objection to Defendants' Bill of Costs, strike Defendants' Bill of Costs, and deny Defendants' Motion for Attorney's Fees.

## I.  Facts and Procedural History

On December 1, 2008, Plaintiffs filed their Complaint in the above-captioned litigation.  *See* Compl., Doc. No. 1.  Demonstrative of Plaintiffs' immediate intent to rely upon specific jurisdiction and the "effects test" of *Calder v. Jones*, 465 U.S. 784 (1984), in the "Venue and Jurisdiction" section of their Complaint, Plaintiffs alleged that Defendants were subject to venue and jurisdiction in the Southern District of Indiana arising from Defendants' "knowledge that their herein-described actions would have an effect and an impact in Indiana."  *Id.* ¶ 3.1.

In furtherance of their specific jurisdiction allegation, Plaintiffs promptly sent Defendants discovery requests that would allow Plaintiffs to substantiate their assertion that Defendants knowingly directed activity into Indiana. *See* Pls' Ex. 1. Plaintiffs' second document request contained in their jurisdiction-based discovery asked Defendants to produce "[r]ecords of communications to any person related to the Incident in Question (including emails and other materials maintained electronically)." *See* Pls' Ex. 1, RFP No. 2 (parenthetical original). Defendants responded to Plaintiffs' request by indicating, "responsive documents, in our possession and located to date, will be produced." *Id.*

Plaintiffs also submitted a merits-based round of discovery requests on February 6, 2009.[1] *See* Pls' Ex. 2. Defendants responded to Plaintiffs' merits-based discovery on April 16, 2009. *See* Pls' Exs. 3-7. Interrogatory number six of Plaintiffs' merits-based discovery asks Defendants:

> What documents (including emails) are routinely maintained to record complaints/incidents, potential safety hazards, inspections, of the site of the incident in questions.

*See* Pls' Ex. 2, ROG No. 6 (parenthetical original). Defendants indicated that such documents "have been produced" by way of their response of:

> Reports, e-mails and other documents pertaining to the Qarmat Ali water injection facility and the sodium dichromate issue have been produced by Defendants.

*See* Pls' Exs. 3-7, ROG No. 6.

---

[1] Plaintiffs denominated their February 6, 2009 discovery request as their "First Request for Production and First Set of Interrogatories" despite the prior issuance of their January 20, 2009 discovery request because Plaintiffs' January 20, 2009 request pertained to personal jurisdiction whereas Plaintiffs' February 6, 2009 discovery request was Plaintiffs' first request for merits-based discovery.

Document request number two of Plaintiffs' merits-based discovery asked Defendants to produce, "[c]opies of any and all statements or reports made by . . . Defendants concerning the subject matter of this lawsuit." *See* Pls' Ex. 2, RFP No. 2. Defendants responded to this request by indicating, [w]ith regard to any statements made by Defendants, please see the reports, e-mails, and other documents produced jointly by the Defendants." *See* Pls' Ex. 3-7 RFP No. 2.

Document request number twelve of Plaintiffs' merits-based discovery asked Defendants to produce:

> The documents identifying when you first became aware that toxic substances, including sodium dichromate, were present at the Plant, including but not limited to any site assessment or inspections conducted.

*See* Pls. Ex. 2, RFP No. 12. Defendants responded to this request by directing Plaintiffs to "see the documents produced jointly by Defendants." *See* Pls' Exs. 4-5, RFP No. 12.

Document request number sixteen of Plaintiffs' merits-based discovery asked Defendants to produce:

> The daily logs, including but not limited to those created by the Health Safety and Environmental ("HSE") Team, regarding Project Restore Iraqi Oil ("RIO") or the Plant.

*See* Pls. Ex. 2, RFP No. 16. Defendants responded to this request by indicating, "[p]lease see the documents produced jointly by Defendants." *See* Pls' Exs. 3-7, RFP No. 16.

Document request number seventeen of Plaintiffs' merits-based discovery asked Defendants to produce "[t]he correspondence or e-mails regarding the

exposure of individuals working at the Plant to toxic/hazardous chemicals/substances, including sodium dichromate." *See* Pls. Ex. 2, RFP No. 17. Defendants responded to this request by indicating, "[p]lease see the documents produced jointly by Defendants." *See* Pls' Exs. 3-7, RFP No. 17.

Finally, document request number twenty of Plaintiffs' merits-based discovery asked Defendants to produce:

> The documents exchanged with government agencies or officials of Kuwait, Iraq, the United States, any State Government, the United Nations, or other governments regarding the Plant, Project RIO, and or the exposure of individuals to toxic substances such as sodium dichromate (including but not limited to the U.S. Military).

*See* Pls. Ex. 2, RFP No. 20 (parenthetical original).  Defendants responded to this request by indicating, "[please see the documents produced jointly by Defendants." *See* Pls' Exs. 3-7, RFP No. 20.

Tellingly, Defendants only produced 3578 pages of documents in response to Plaintiffs' above-quoted discovery requests.  Plaintiffs were, consequently, immediately perplexed by Defendants' dearth of document production.  Because of the acknowledged presence of sodium dichromate at Qarmat Ali and the extreme hazards presented thereby, the enormity of the undertaking of Qarmat Ali, and the fact that it took Defendants nearly a year to bring Qarmat Ali on line, Plaintiffs expected considerably more than 3578 pages of documents.  Moreover, the vast majority of the documents provided by Defendants have nothing to do with sodium dichromate and, instead, consisted of supply logs or other matters largely peripheral to the above-captioned litigation.  Plaintiffs were also surprised that

Defendants did not produce a privilege log.  Finally, Plaintiffs were perplexed by the absence of emails contained in Defendants' production.

To add to Plaintiffs' then-growing belief that Defendants had materially failed to fulfill their discovery obligations, Defendants' response to Plaintiffs' seventh interrogatory request demonstrated that document destruction could not account for the dearth of Defendants' production.  Specifically, Plaintiffs' seventh interrogatory request asked Defendants:

> What documents (including emails) directly relating to the Incident in Question (record complaints/incidents, potential safety hazards, inspections, of the site of the Incident in Question) have been destroyed or discarded.

See Pls' Ex. 2, ROG No. 7.   Defendants responded to Plaintiffs' interrogatory request by noting:

> [Defendants are] not aware of any specific documents relevant to sodium dichromate issues at the water injection facility that have been destroyed or discarded.  In April 2004, the Department of Justice issued retention directives to all KBR entities for all documents communications regarding the RIO and other government contracts.

See Pls' Exs. 3-7, ROG No. 7.   The Department of Justice's retention order, combined with the absence of a privilege log and Defendants' production of less than 4000 documents that had little to do with sodium dichromate, demonstrated that something was seriously amiss with regard to Defendants' discovery responses.

### A.  Rod Kimbro's Deposition:   The First Confirmation that Defendants were withholding Responsive and Highly-Probative Documents

Plaintiffs' suspicions of discovery impropriety were first confirmed when Plaintiffs began to depose former employees of Defendants.  On September 30, 2009,

Plaintiffs deposed Rod Kimbro ("Kimbro"), who is a former employee of Defendants and had conducted environmental safety work for Defendants at Qarmat Ali. During Kimbro's deposition, Kimbro revealed that he had retained a copy of a June 21, 2003 email raising a red flag to Defendants' managers about the presence of sodium dichromate and the danger resulting therefrom. Not only had Defendants failed to disclose Kimbro's email in response to Plaintiffs' above-cited discovery requests but, despite the fact that Kimbro had specifically provided Defendants' attorney Randy Jones ("Jones") with a copy of his email two days prior to his deposition, Jones only provided Plaintiffs with a copy of Kimbro's email after its existence was disclosed by Kimbro during his deposition.

The manner in which Kimbro's email was disclosed is indicative of Defendants' subterfuge:

> Answer:  I had prepared a number of reports. I also had a number of e-mails that I had sent to Dr. Lee concerning Qarmat Ali. And when I left KBR's employment I kept copies of those. And I provided copies of those to KBR's attorneys and we discussed those documents.
>
> Question:  When did you provide those documents, e-mails that you told us about?
>
> Answer:  I don't know the exact day, but it was within the last month.
>
> Mr. Doyle:  Mr. Jones, has every single one of those documents been provided?
>
> Mr. Jones:  We produced them to you, yes. I don't know what the Bates label range is. He *may have* given me a document or two yesterday that was new to me.
>
> Mr. Doyle:  Okay. Have we been provided that or is there a reason why we haven't been provided it right now?

| | |
|---|---|
| Mr. Jones: | Because you have – don't have a document request for this deposition. |
| Mr. Doyle: | Okay. |
| Mr. Jones: | But we produced to you -- |
| Mr. Doyle: | Just so we're clear – |
| Mr. Jones: | Right. |
| Mr. Doyle: | -- are you really telling us that materials this gentleman evaluated working KBR Qarmat Ali are not encompassed within the outstanding discovery requests that were required to be supplemented timely? |
| Mr. Jones: | No. I'm not saying that. What I'm saying is, we have produced all the documents that he gave us to – what was it – a month or two ago that's been produced to you. |
| Mr. Doyle: | Okay. You just mentioned some additional documents. |
| Mr. Jones: | Right. *If* he gave us anything new, I haven't produced that to you yet. |
| Mr. Doyle: | Okay. Is there a reason why we can't get a copy now? |
| Mr. Jones: | No. |
| Mr. Doyle: | Are you going to give us a copy? |
| Mr. Jones: | Yes. *We'll have to make copies.* Okay? |
| Mr. Doyle: | Is there a reason why we're waiting until the middle of the deposition to get it if you've had this for some period of time? |

*See* Pls' Ex. 8, Kimbro Dep. pp. 20-22 (emphasis added).

Aside from the fact that the below-discussed email that was necessarily on Defendants' electronic server and that Kimbro "may have" provided to Jones a couple of days prior to his deposition was clearly responsive to Plaintiffs' above-cited merits and personal jurisdiction-based discovery requests and should have been

8

provided to Plaintiffs pursuant to Defendants' above-cited responses to Plaintiffs' requests for production, there are a number of aspects of Jones' conduct that indicate that Jones was attempting to undermine improperly Plaintiffs' discovery efforts.  Most notably, as demonstrated by the fact that Jones had not made copies of Kimbro's June 21, 2003 email that Jones "may have" had in his possession, Jones had no intention of disclosing Kimbro's email to Plaintiffs.

Moreover, it is blatantly improper to disclose responsive discovery in the middle of the deposition only after Plaintiffs' knowledge thereof is obtained.  Had Jones succeeded in his obvious attempt to keep from disclosing Kimbro's June 21, 2003 email, Jones would have precluded Plaintiffs from questioning Kimbro concerning the obvious inference that Kimbro retained his email—despite the passage of more than six years and leaving Defendants' employment—due to his knowledge of Defendants' misdeeds at Qarmat Ali.

Finally, even a cursory examination of Kimbro's June 21, 2003 email that was sent to Defendants' managers prior to Plaintiffs' arrival at Qarmat Ali and "may have" been provided to Jones prior to Kimbro's deposition demonstrates its importance to this litigation and Defendants' motive not to produce it.  After Kimbro notes that Mark Daniels ("Daniels") had asked him to evaluate the use of sodium dichromate at Qarmat Ali, Kimbro notes:

> Sodium dichromate has been replaced as a commonly utilized corrosion inhibitor in the US due to its toxicity and disposal issues.  Sodium dichromate is a strong irritant and a potential carcinogen.  The MCL for Total [sic] chromium in drinking water is 0.1 mg/L.  The MSDS for sodium dichromate and materials contaminated with sodium dichromate would be considered hazardous waste in the US.

During our inspection of the chlorine tanks at the water treatment plant, I observed areas of soil that had been discolored yellow east and southeast of the chlorine drums and on the west side of the chlorine tank storage area.   The areas are potentially contaminated with sodium dichromate spilled during the looting activities which occurred at the water treatment plant.

Due to the potential toxicity of sodium dichromate I suggest that the areas of soil stained yellow be cordoned off and that samples be collected and tested to determine the concentration of hexavalent chromium and total chromium in these areas.   If it is determined that the yellow soils are contaminated with sodium dichromate, I recommend that these soils be excavated and placed in drums; the drums being labeled and stored in a secure area.   The excavation should proceed at least one foot in all directions past the yellow staining.

*See* Pls' Ex. 9.

To place the importance of Kimbro's June 21, 2003 email alerting Defendants of sodium dichromate's presence at Qarmat Ali, the danger posed thereby, the need for testing, and Kimbro's recommended method of remediating the sodium dichromate hazard into perspective, an August 15, 2003 email from Defendants' manager Young Lee demonstrates that (1) the military was still largely unaware of the extent of the danger confronting soldiers at Qarmat Ali nearly three months after Kimbro had alerted Defendants of sodium dichromate's presence and danger presented thereby; (2) the military was requesting such details from Defendants in mid-August; (3) the tests recommended by Kimbro in June had yet to be perfected approximately three months later; and (4) Kimbro's recommended method of remediation was never heeded.   *See* Pls' Ex. 10.   More incredibly, Young Lee notes of his response to the military's request, "[w]hat I told [the officer making this request was] that test results were preliminary and could not be provided until final results are confirmed.   *Id.*

10

B. *Communications from the Army: The Second Confirmation that Defendants were withholding Responsive and Highly-Probative Documents*

Plaintiffs were next alerted to the fact that Defendants had not complied with their discovery obligations by way of their November 2009 communications with the Army. Specifically, Mike Doyle ("Doyle"), attorney for Plaintiffs, contacted the Army about the status of Plaintiffs' Freedom of Information Act request that was issued in an attempt to obtain Defendants' communications made with the Army regarding sodium dichromate's presence at Qarmat Ali. In a phone conversation, Captain Satterfield informed Doyle that there were *five boxes of documents responsive to Plaintiffs' request.* *See* Pls' Exs. 11. Doyle's email to Captain Satterfield memorializes his communications with Captain Satterfield and provides in part:

> You have indicated that a large number of approximately five (5) boxes of responsive documents are subject to forwarding to/review by KBR on alleged "trade secret/proprietary" grounds, and you will be forwarding those documents to KBR's counsel in the same time frame.[2]

*Id.* The Army's above-quoted representations further establish Defendants' pervasive non-compliance with their discovery obligations, as Defendants have not provided Plaintiffs with even a quarter-inch of documents regarding their communications with the Army—let alone five boxes of documents.

---

[2] Trade secret and proprietary grounds provide no basis for withholding responsive documents—let along withholding responsive documents without notifying Plaintiffs—as a protective order has been entered in this case. *See* Doc. No. 62.

### C. Plaintiffs' Attempt to Determine whether Defendants were Withholding Documents

On January 27, 2010, undersigned counsel asked Jones of the status of Defendants' production of the below-discussed "SITREP" documents, and Jones responded in part, "[t]he only additional docs we have to produce are SITREPS." *See* Pls' Ex. 12. Aware of the dearth of documents produced by Defendants, the five boxes of communications between the Army and Defendants that had not been provided by Defendants, and Defendants' failure to produce Kimbro's June 21, 2003 email, undersigned counsel requested of Jones:

> Can you please clarify what you mean by "the only additional docs we have to produce." Do you mean to say "you are in possession of no additional documents" or that "you have additional documents, but do not have to produce them."

*Id.* Consistent with Defendants' above-quoted discovery responses indicating that the responsive documents had been produced, Jones assured undersigned counsel that:

> The only documents we have in our possession that we are working on producing to you are the redacted [SITREPS]. *I am not withholding any other documents that plaintiffs have requested.*

*Id.* (emphasis added).

### D. Daniels' CD: The Third Confirmation that Defendants were withholding Responsive and Highly-Probative Documents

Just sixteen days after Jones' January 27, 2010 email affirmation to undersigned counsel of his and Defendants' compliance with their discovery obligations, Jones' affirmation was proven to be inaccurate both as it related to him and to Defendants. On February 12, 2010, Plaintiffs deposed Daniels, another

12

former employee of Defendants and Defendants' manager in charge of Qarmat Ali. Like Kimbro, Daniels had kept documents concerning Defendants' conduct at Qarmat Ali and had uploaded them onto a CD. *See* Pls' Ex. 13, Daniels Dep. p. 169. As was the case with Kimbro's June 21, 2003 email, Plaintiffs only learned of the existence of Daniels' CD by way of questioning Daniels during his deposition. *Id.*

Defendants' knowledge of and corresponding failure to disclose the documents contained on Daniels' CD is demonstrated by Daniels' testimony, which stated in part:

Question:   When did you allow KBR's lawyer to go through this CD you maintained?

Answer:   *A few weeks ago* when I met [Jones] here.

Question:   And did you actually go through the CD and identify documents about Qarmat Ali, sodium dichromate, when you went through this CD you have, several weeks ago?

Answer:   Actually, I don't really know the real purpose of what I was supposed to be talking about anyway.  What I—what I wanted to let [Jones] know is that I did have information about the plant because I was there and I didn't know that—if that would be useful information or not.

Question:   I want to talk about the process because you actually met face-to-face with KBR's lawyer several weeks before your deposition and you actually said, [h]ere is a CD I have, I kept memos and minutes; is that what you did?

Answer:   Yeah.  Well, I actually, I believe that I—*I gave KBR also that same information three years ago.*

Question:   When you say you gave KBR, three years ago, the same information on this CD, including the memos we saw today?

Answer:   I believe so.

Question:   Who did you give it to at KBR?

Answer:   I believe I gave it to, well, the KBR attorneys.

| Question: | You're pointing to a KBR attorney.  Do you know the KBR attorney that you sent, three years ago, this CD copy, including the memo we see here? |
|---|---|
| Answer: | I believe it was the CD here.  There was—there was some other—it all had to do with the retention of documents, which we were required to do. |
| Question: | And at that point, even three years ago, you mailed a CD to a KBR lawyer, which includes this memo of minutes, July 12th meeting with the Corps of Engineers? |
| Answer: | Uh-huh.  I believe so, yeah. |

*Id.* Daniels Dep. pp. 193-95 (emphasis added).

Like Kimbro's June 21, 2003 email, Daniels' CD is demonstrative of a number of discovery violations on the part of Defendants and Jones.  Even making the extraordinary assumption that Jones was ignorant of the existence of Daniels' CD before his meeting with Daniels, Jones was required to produce responsive documents deriving therefrom promptly rather than immediately prior to Daniels' deposition.  Jones not only failed in this obligation, but inaccurately represented to Plaintiffs by way of his January 27, 2010 email to undersigned counsel that all documents had been produced and "I am not withholding any other documents that plaintiffs have requested."  *See* Pls' Ex. 12.  As demonstrated by Daniels' deposition testimony, Daniels specifically provided his CD to Jones days before Jones made the above-quoted misrepresentation to undersigned counsel and had provided his CD to Defendants years before Jones' misrepresentation.

In a final similarity to Jones' act of withholding Kimbro's June 21, 2003 email, the one document from Daniels' CD that Defendants produced to Plaintiffs immediately prior to Daniels' deposition is extremely probative and useful to

14

Plaintiffs in proving their claims against Defendants. As the reporter was placing a microphone on Daniels, Defendants provided Plaintiffs with a July 12, 2003 meeting minutes agenda between Defendants' managers and the Army Corp of Engineers that was included on Daniels' CD—the only document from Daniels' CD provided to Plaintiffs. *See* Pls' Ex. 14. Page ten of Daniels' meeting minutes discloses that chemical injection was discussed as one of the talking points of the underlying July 12, 2003 meeting between Defendants and the Army Corp of Engineers. *Id.*

As revealed by Daniels' July 12, 2003 meeting notes and Daniels' deposition testimony, despite Kimbro's above-quoted June 21, 2003 admonitions regarding the dangers presented by the sodium dichromate contamination at Qarmat Ali and Defendants' act of discussing sodium dichromate's use at Qarmat Ali with the Army Corp of Engineers, Defendants failed to correspondingly inform the Army Corp of Engineers of sodium dichromate's danger and contamination at Qarmat Ali, and the July 12, 2003 meeting solely discussed "engineering issues" related to sodium dichromate rather than the "harms" presented thereby. *See* Pls' Ex. 13, Daniels Dep. pp. 153-56.

As such, Daniels' July 12, 2003 meeting minutes withheld by Defendants are not only obviously responsive to Plaintiffs' above-cited discovery requests but are also extremely probative because they demonstrate Defendants had the opportunity to inform the Army Corp of Engineers that sodium dichromate had contaminated the entire premises at Qarmat Ali and that members of the Indiana National Guard

15

were walking, eating, and sleeping in this highly-carcinogenic and toxic chemical that was "blowing in the open wind." *See* Pls' Ex. 15 (KBR internal document disclosing that "almost 60% of the people now exhibit symptoms" and "wind is blowing the product that is lying dry on the ground"); *see also* Pls' Ex. 16 (KBRS self-examination stating, "[t]he toxic chemical had contaminated the entire area").

Defendants' basis for refusing to provide Plaintiffs with the remaining documents contained on Daniels' CD also speaks to Defendants' pervasive attempt to undermine the discovery process.  Immediately upon learning of the existence of Daniels' CD, Plaintiffs issued a February 15, 2010 Subpoena for its production. *See* Pls' Ex. 17.  Defendants have moved to quash this Subpoena in the United States District Court for the Southern District of Texas. *See* Pls' Ex. 18.  Despite the fact that Defendants failed to produce a privilege log in this litigation and bearing in mind that Defendants have been in possession of Daniels' CD for three years and, therefore, are well aware of its contents, Defendants are moving to quash the production of Daniels' CD on the basis that the subpoena "potentially seeks the production of privileged documents." *See* Pls' Ex. 17 ¶¶ 7(b), 12.

E. *Other Documents Improperly Withheld: The Fourth Confirmation that Defendants were withholding Responsive and Documents*

The most alarming aspect surrounding Defendants' non-production of Kimbro's June 21, 2003 email and Daniels' CD is that Defendants' failure not only demonstrates pervasive bad faith on the part of Defendants but also suggests that Kimbro's June 21, 2003 email and Daniels' CD are the proverbial "tip of the iceberg."  The remainder of Daniels' deposition testimony confirms that there is a

16

bevy of responsive and highly-probative documents that have yet to be produced by Defendants.

For example, Daniels indicated in his deposition that he received an email from Kimbro outlining the presence of sodium dichromate as well as the steps that should have been undertaken to remediate the danger presented thereby. *See* Pls' Ex. 13, Daniels Dep. pp. 34-36. Notably, Kimbro's above-cited June 21, 2003 email did not include Daniels as a recipient, and the email referred to by Daniels' testimony could not have been the same email. *See* Pls' Ex. 9. Yet, this email attested to by Daniels was not disclosed in Defendants' document production despite Defendants' above-cited discovery responses stating that all documents had been produced

Similarly, Daniels indicated in his deposition that Defendants' upper-management was informed of the sodium dichromate hazard at Qarmat Ali in June 2003 via emails with "large distribution," that Kimbro's email was not the only email that he remembered seeing regarding sodium dichromate, that "several" emails went back and forth, and that he would have sent Kimbro's email "to all kinds of people in our organization; particularly, our top management." *See* Pls' Ex. 13, Daniels Dep. pp. 40, 68-69, 88. Daniels lastly indicated that, when meeting notes or trip reports were created, they were also forwarded via email. *See id.* at pp. 61, 63, 66. Yet, Defendants have failed to produce these numerous highly-probative emails attested to by Daniels despite Defendants' above-cited discovery responses indicating that all documents had been produced.

Daniels' deposition testimony also reveals that Defendants failed to disclose countless other forms of responsive and highly-relevant documents.  For example, Defendants created "Project RIO *Daily* HSE Logs" that relate to health, safety, and environmental risks in executing project RIO.  *See* Pls' Ex 19 (emphasis added).  As was testified to by Daniels, it was normal protocol for Defendants to generate such health, safety, and environmental logs "daily."  *See* Pls' Ex. 13, Daniels Dep. p. 109.  Yet, Defendants have produced a dearth of "daily" HSE logs despite Defendants' above-cited discovery responses stating that all documents had been produced.

Finally, Daniels testified that he would expect his May 2003 Qarmat Ali site assessment report to be contained within Defendants' electronic document system, and Defendants' April 27, 2003 "SITREP" references two "assessments" of Qarmat Ali as well as an additional "deliberate assessment" of Qarmat Ali.  *See* Pls' Ex. 13, Daniels Dep. pp. 121-22; *see also* Pls' Ex. 20 §§ 1.1.4, 1.2.3, 2.1.2.  Yet, Defendants have failed to produce such assessments despite Defendants' above-cited discovery responses stating that all documents had been produced.

### F. *Defendants' Failure to Disclose Substantial Forum Contacts in West Virginia:  The Fifth Confirmation that Defendants were withholding Responsive and Highly-Probative Documents*

Because of Defendants' numerous above-cited failures to comply with their discovery obligations, Plaintiffs understandably believe that Defendants were equally evasive in their responses to Plaintiffs' jurisdiction-based discovery inquiring about Defendants' forum contacts.  Substantiating Plaintiffs' contention that Defendants' discovery violations were pervasive, in the West Virginia sister

case to this litigation, Defendants brazenly failed to disclose numerous forum contacts with West Virginia.

The West Virginia Plaintiffs submitted the following jurisdiction-based requests for production that mirror Plaintiffs' Indiana jurisdiction-based discovery:

> The documents, correspondence, and/or communications relating to all certifications, *licenses*, and permits for which you have applied or have obtained in or from West Virginia.
>
> The documents, communications, and/or correspondence relating to or pertaining to real or *personal property* in West Virginia that is owned, leased, operated, utilized, rented, or maintained by you.
>
> The documents, communications, and/or correspondence relating or referring to taxes paid on *all personal property*, including, but not limited to, all types and sizes of *trucks, cars*, equipment, and plants that are owned, leased, utilized, rented, operated, or maintained in West Virginia.

*See* Pls' Ex. 21, RFP Nos. 2, 18, 21 & 23 (emphasis added). Consistent with Defendants' failure to disclose responsive documents in this litigation despite Defendants' discovery responses' statements that Defendants had done so, in response to the West Virginia Plaintiffs' above-quoted requests, Defendants stated that their "internal investigation did not reveal any such documents." *See* Pls' Ex. 22, RFP Nos. 18, 21 & 23.

Despite Defendants' above-cited responses indicating that Defendants (1) had located no documents disclosing West Virginia licenses, (2) had located no documents relating to personal property within West Virginia, and (3) had not paid taxes on any trucks, cars, or equipment in West Virginia, West Virginia DMV records demonstrate that KBR, Inc. has *118 vehicles* registered and licensed in West Virginia. *See* Pls' Ex. 22. Defendants' failure to disclose their substantial

forum contacts goes well beyond their material failure to identify KBR, Inc.'s 118 vehicles, as 118 vehicles licensed and registered in West Virginia necessarily indicate that Defendants have other undisclosed substantial forum contacts.

In light of Defendants' above-discussed discovery violations in this litigation, Defendants' below-discussed discovery violation disclosed by their attorney billing records, and Defendants' failure to disclose 118 vehicles that were licensed and registered in West Virginia in response to personal jurisdiction-based discovery, it would be naïve to conclude that Defendants were above withholding documents and information evidencing Defendants' forum contacts in response to their personal jurisdiction-based discovery in this litigation.

### G. Defendants' Billing Records: The Sixth Confirmation that Defendants were withholding Responsive and Highly-Probative Documents

On February 25, 2010, this Court granted Defendants' Motion to Dismiss for Lack of Personal Jurisdiction. *See* Doc. No. 127.  On March 16, 2010, Defendants filed their Bill of Costs and their Motion for Attorney's Fees. *See* Doc. Nos. 129 & 130.  In a particularly fitting display of poetic justice, Defendants' attorney billing logs submitted in support of their claim for attorney's fees disclose yet another discovery violation and, again, demonstrate that Defendants improperly "ascribed unto themselves the role of judge and jury" in this litigation. *See Novelty, Inc. v. Mountain View Mktg, Inc.*, 2009 WL 3444591 * 6 (S.D. Ind. 2009).

Consistent with Defendants' Motion to Quash the February 15, 2010 Subpoena wherein Defendants asserted "possible privilege" as a basis for quashing the Subpoena, Ice Miller, LLP's time entry for April 1, 2009 demonstrates that

Defendants' attorneys "reviewed documents for privilege." *See* Pls' Ex. 24. A second Ice Miller, LLP time entry for April 1, 2009, provides that Defendants' attorneys "assisted in developing strategy for preparing privilege log." *Id.* In Ice Miller, LLP's April 3, 2009 entry, it is noted that there was a "[d]iscussion with Thomas regarding privileged documents in production and privilege log." *Id.* Finally, by way of an April 7, 2009 time entry, Ice Miller, LLP indicates that Defendants' attorneys "[i]dentified privileged bates numbers and supplemented *internal privilege log* and *production privilege log*." *See* Pls' Ex. 25 (emphasis added).

As demonstrated by Ice Miller, LLP's attorney's time entries, Defendants had withheld documents as well as had created an "internal privilege log" and a "production privilege log." Yet, despite the passage of nearly eleven months, Defendants failed to produce either their "internal privilege log," their "production privilege log," or to otherwise fulfill their obligations imposed by Rule 26(b)(5)(A) of the Federal Rules of Civil Procedure. Moreover, Ice Miller, LLP's above-cited time entries revealing the existence of withheld documents as well as the creation of an "internal privilege log" and a "production privilege log" very likely constitute a small percentage of such entries, as (1) Defendants are only claiming attorney's fees related to personal jurisdiction-related matters, (2) Ice Miller, LLP's time entries are heavily redacted, and (3) it is altogether probable that the vast majority of Defendants' privilege review was conducted by Defendants' Houston, Texas counsel rather than Ice Miller, LLP.

## II.  Plaintiffs' Objection to Defendants' Bill of Costs

A district court may consider an opposing attorney's objection to a bill of costs submitted by the prevailing party pursuant to Federal Rule of Civil Procedure 54(d) even though the court clerk has not yet taxed costs.  *See* 21A Fed. Proc. L. Ed. § 51:108, Bill of Costs; *see also Nelson v. Darragh Co.*, 120 F.R.D. 517, 518 (N.D. Ark. 1988).   Pursuant to this authority, Plaintiffs now object to and move to strike Defendants' Bill of Costs because Defendants have no standing to petition for costs, parties who engage in discovery misconduct are not entitled to costs, and the costs presented by Defendants are not permitted by statute.

### A.  *Defendants Lack Standing to Petition for Costs*

The lone statement Defendants provide in support of their assertion that they are entitled to costs is their Motion for Attorney's Fees' indication that "Defendants are also filing a separate Bill of Costs per Fed. R. Civ. Proc. 54(d)(1)." *See* Defs' Br. in Supp. p. 2, n. 1.   Rule 54(d)(1) of the Federal Rules of Civil Procedure, however, provides that, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed *to the prevailing party*."   Fed. R. Civ. Proc. 54(d)(1) (emphasis added).   Defendants have no standing to present their Bill of Costs pursuant to Rule 54(d)(1) because Defendants are not "prevailing parties" within the meaning of Rule 54(d)(1).

As stated by *Gossett v. Porsche Cars N. Am., Inc.* while determining that a personal jurisdiction-based dismissal does not render a litigant a prevailing party:

> The parties in these cases did not sufficiently establish their entitlement to relief on the merits of their claims.  Such successes are not "the stuff of which legal victories are made."

2006 WL 3007384 * 2 (D.S.C. 2006) (quoting *Hewitt v. Helms*, 482 U.S. 755, 760 (1987)).   Similarly, *ITI Holdings, Inc. v. Professional Scuba Association, Inc.* provides:

> Most courts which have directly addressed the issue have held that a party successful on a motion to dismiss for lack of personal jurisdiction is not a prevailing party for purposes of any statute making attorney's fees available to prevailing parties.

2007 WL 10002245 (D. Me. 2007); *see also Caraustar Custom Packaging Group (Maryland), Inc. v. Stockart.com, LLC*, 2006 WL 3371679 (W.D.N.C. 2006) ("In order for the defendant [sic] be a prevailing part, there must be a court ordered change in the legal relationship between the plaintiff and defendant in the defendant's favor . . . a dismissal for lack of personal jurisdiction does not"); *Dahn World Co. Ltd. v. Chung*, 2006 WL 3313951 * 2-3 (D. Ariz. 2006); *Catalina Mktg. Intern., Inc. v. Coolsavings.com, Inc.*, 2004 WL 421739 * 2 (N.D. Ill. 2004); *Lichtenfeld v. Juniper Features, Ltd.*, 1996 WL 685443 (N.D. Ill. 1996).   Thus, because Defendants' personal jurisdiction victory does not render them a prevailing party, they have no standing to petition for costs pursuant to Rule 54(d)(1).

B.  *Defendants' Discovery Violations Preclude an Award of Costs*

Misconduct by a litigating party is a well-recognized basis for denying an award of costs.  *See Contreras v. City of Chi.*, 119 F.3d 1286, 1295 (7th Cir. 1997); *see also Hudson v. Nabisco Brands, Inc.*, 758 F.2d 1237, 1242 (7th Cir. 1995); *Sheets v. Yamaha Motors Corp. U.S.A.*, 891 F.2d 533, 539-40 (5th Cir. 1990).   Stated simply,

having flouted the power of this Court by way of their many above-disclosed discovery violations, Defendants' invocation of the power of this Court to award more than $120,000 in attorney's fees and more than $34,000 in costs is offensive and should not be sanctioned.

### 1. Defendants' Failure to Disclose Responsive Documents

Rule 34(b)(2)(A) of the Federal Rules of Civil Procedure requires a party to submit a proper response to a discovery request within thirty days after service. *Novelty, Inc.*, 2009 WL 3444591 * 3. Pursuant to this response, the responding party must actually produce all responsive documents over which the party has control for inspection or copying. *Id.* (citing *Langley by Langley v. Union Elec. Co.*, 107 F.3d 510, 513 (7th Cir. 1997)).

> If the responding party cannot conduct a careful and thorough search for all responsive documents within the thirty-day period, it has an obligation to seek appropriate extensions. Unilaterally deciding to conduct a cursory initial search to be followed by "rolling" productions from subsequent, more thorough, searches is not an acceptable option. Rule 34 guarantees that the requesting party will receive, concurrently with the response, **all** documents reasonably available.

*Id.* at 4 (emphasis original) (internal citations omitted). A party also has a duty to supplement "in a timely manner" if the party learns that its prior response is incomplete. *Id.* (citing FED. R. CIV. PRO. 26(e)(1)(A)). Moreover, supplementing discovery does not absolve the non-producing party from their initial failure to produce. *Id.* "If a party did not take 'reasonable steps to ensure that its responses for production were complete and accurate, later supplementation does not absolve the party.'" *Id.*

Pursuant to the above-cited authority, Kimbro's June 21, 2003 email and the contents of Daniels' CD should have been and were not disclosed by Defendants pursuant to their April 16, 2009 discovery responses.  Furthermore, even if Defendants had not located the documents contained on Daniels' CD and Kimbro's June 21, 2003 email substantially prior to Kimbro's and Daniels' deposition—and they should have and did—Defendants' supplementation during the middle of a deposition was hardly timely.  Finally, Defendants act of withholding numerous emails and other sodium dichromate-related documents that were attested to by Daniels and that are necessarily on Defendants electronic server also constitutes a sanctionable discovery violation.

These multiple discovery violations not only constitute an affront to the power of this Court but, especially when combined with Defendants' withholding of substantial forum contacts in West Virginia, leave Plaintiffs with the understandable conviction that their personal jurisdiction dismissal was the result of Defendants' discovery tactics rather than a fair adjudication.

## 2.  *Failure to Produce a Privilege Log*

In addition to withholding highly-relevant and responsive documents, Defendants also unquestionably violated Rule 26(b)(5)(A) of the Federal Rules of Civil Procedure, which expressly requires litigants withholding discovery on the basis of privilege to produce a privilege log that describes the nature of the document withheld so as to allow the opposing party to assess the claim of privilege. *See* FED. R. CIV. PROC. 26(b)(5)(A); *see also* FED. R. CIV. PROC. 26(b) *Comment* (to

withhold material without such notice is contrary to the rule and subjects the party to sanctions); *Pub. Serv. Co. of N.H. v. Portland Natural Gas*, 218 F.R.D. 361, 363 (D.N.H. 2003) (violations of Rule 26(b)(5) subjects a party to sanctions pursuant to Rule 37); *Travel Sentry, Inc. v. Tropp*, 669 F.Supp.2d 279, 284 (E.D.N.Y. 2009) (the default sanction for failing to produce a privilege log is an award of attorney's fees).

Although the federal courts interpreting Rule 26(b)(5) are split as to whether Rule 26(b)(5) requires a party to submit a privilege log at the time of their discovery response, no federal court allows a party to withhold privileged documents for nearly eleven months while failing to submit a privilege log to their opponent—as was done by Defendants in this litigation. *See Hobley v. Burge*, 433 F.3d 946, 947 (7th Cir. 2006) (an attorney asserting privilege must timely support that claim with a privilege log which describes the nature of each document being withheld); *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 2009 WL 331608 (M.D. Fla. 2009) (the 1993 advisory committee note to Rule 26(b)(5) contemplates that the privilege log will be served at the time the discoverable information is withheld and a party need not request a privilege log in order for a party's duty to produce such a log is triggered); *Marx v. Kelly, Hart & Hallman, P.C.*, 929 F.2d 8, 12 (1st Cir. 1991) (citing *Peat, Marivich, Mitchell & Co. v. West*, 748 F.2d 540, 541 (10th Cir. 1984)); *In re Erickson*, 2009 WL 4868301 * 2 (D. N.D. 2007); *Aecon Bldgs., Inc. v. Zurich N. Am.*, 253 F.R.D. 655, 660 (W.D. Wash. 2008); *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005).

### C. Defendants seek Costs not Permitted by 28 U.S.C. section 1920

In yet another flaw underlying Defendants' Bill of Costs, the vast majority of the costs sought by Defendants are not recoverable.  Before a court may tax costs upon the losing party, the court must determine that the cost are reasonable and necessary to the litigation.  *Little v. Mitsubishi Motors N. Am., Inc.*, 514 F.3d 699, 702 (7th Cir. 2008).  In submitting their prayer for $34,277.73 in costs, Defendants make absolutely no attempt to distinguish which costs were necessary for obtaining their personal jurisdiction ruling.  Moreover, the majority of Defendants' costs will be obviated by the fact that Defendants will not have to duplicate the work underlying such costs when Plaintiffs refile in another jurisdiction.  Thus, Defendants' claimed costs are neither reasonable nor necessary, as they were not necessary for this Court's personal jurisdiction ruling and will provide Defendants with a windfall.

Furthermore, Defendants' claimed cost of $16,279.61 for computer-generated research is not included as a permissible cost by 28 U.S.C. section 1920.  Although *Little* appears to indicate—in passing and without analysis—that computer-generated research is a compensable expense, consistent with the well-established rule that a cost must be allowed by a statute before a party may petition for it, subsequent cases have called *Little's* holding into serious question.  514 F.3d at 701.  As provided by *Thomas v. City of Peoria, Illinois*:

> *Little* seems to say that computerized research fees are recoverable. However, there is significant Seventh Circuit authority providing that computerized legal research costs are only recoverable as part of an attorney fee award rather than as costs of suit.  Indeed, even in

> [*Little's* cited case of] *Burda*, the court also awarded attorney's fees; it
> is not clear from the opinion whether the computerized legal research
> costs were awarded as part of the attorney's fees or as costs of suit . . .
> The Court will follow [three Seventh Circuit cases] in finding that
> computerized research fees are not recoverable.

2009 WL 4591084 * 2 (C.D. Ill. 2009); *see also Mason v. Smithkline Beacham Corp.*,

2008 WL 5397579 * 4 (C.D. Ill. 2008) ("The Court does not believe that the Court of

Appeals would cast aside such well-established precedent with a passing reference,

and therefore concludes that the passage from *Little* [that provides for computer-

generated research costs] relied on by Defendants is not only dicta, but also *quite*

*probably was a typographical error*") (emphasis added).

Thus, this Court should not award Defendants $16,279.61 in computer-

generated research expenses because such expenses are not listed as a recoverable

cost pursuant to 28 U.S.C. section 1920.   *See Republic Tobacco Co. v. N. Atl.*

*Trading Co., Inc.*, 481 F.3d 442, 447 (7th Cir. 2007) ("a district court may not tax

costs under Rule 54(d) unless a federal statute authorizes an award of costs") (citing

*Crawford Fiting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441-43 (1987)).

### III.  Defendants' Motion for Attorney's Fees

Defendants seek an award of attorney's fees premised upon 28 U.S.C. section

1927, Indiana Code section 34-52-1-1(b), and this Court's inherent authority to

sanction a litigant.  See Def's Br. in Supp. at 2.  Defendants do not come remotely

close to meeting their burden of establishing their entitlement to an award of

attorney's fees under any of their theories.

A. *28 U.S.C. section 1927 does not Authorize an Award of Attorney's Fees*

In setting forth the standard for an award of attorney's fees pursuant to 28 U.S.C. section 1927, Defendants—citing *In re TCI Limited*—improperly attempt to reduce their burden to a negligence showing by way of their assertion that "if a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious." *See* Def's Br. in Supp. at 3 (citing *In re TCI Limited*, 769 F.2d 441, 445 (7th Cir. 1985)).  Defendants' proffered standard has been soundly rejected by the Seventh Circuit. As provided by *Kotsilieris v. Chalmers*:

> Chalmers also relies on *TCI* in arguing that objectively unreasonable conduct satisfies section 1927's vexatious requirement.  However, we must be careful to place that case in context.  In *TCI* this Court was grappling with the question of whether bad faith meant something other than subjective ill will.  Thus, any reference to objective unreasonableness in that case was made in order to emphasize that bad faith can be demonstrated by objective as well as subjective evidence— which we explained meant that recklessness or indifference to the law constitutes bad faith.  Stating that bad faith has an objective component is far from saying that ordinary negligence constitutes bad faith.

966 F.2d 1181, 1184 (7th Cir. 1992) (internal citation omitted).  As was consistently stated by Judge Young in *Webster v. Hilex Poly Co., LLC*, "[t]he Court finds that Mr. Waterfill's conduct was negligent, but not "extremely negligent" or reckless.  As such, a finding of objective bad faith has not been shown."  2008 WL 5235975 * 3 (S.D. Ind. 2008).

In addition to proffering the wrong standard, Defendants' allegation that Plaintiffs' theory of jurisdiction was negligent—to say nothing of extremely negligent—is patently unreasonable.  The entirety of Defendants' assertion that

Plaintiffs' reliance on *Calder* in support of their theory of jurisdiction was unreasonable consists of Defendants' statement that:

> This Court rejected such a finding, calling Plaintiffs' argument "too tenuous" to support a finding of *Calder* jurisdiction because Defendants alleged conduct applied to anyone who visited Qarmat Ali regardless of where they were from or where they were going. That point would have been obvious to any reasonable attorney reading the *Calder* decision.

*See* Defs' Br. in Supp. at 7. Defendants' argument does not approach the showing that is necessary to obtain an award of attorney's fees.

It is hoped that the Court will appreciate the awkward position that Plaintiffs are in, being forced to assert why their theory of jurisdiction was reasonable, and Plaintiffs' statements below are made for the purpose of demonstrating the reasonableness of their theory of jurisdiction and are not intended to show disrespect for the court. Plaintiffs' purpose in discussing their theory of jurisdiction is to demonstrate that, under no circumstances, were Plaintiffs negligent in presenting their theory of jurisdiction.

The first reason that this Court provides for rejecting Plaintiffs' theory of specific jurisdiction is its conclusion that Plaintiffs presented no evidence that Defendants knew members of the Indiana National Guard intended to return to Indiana upon leaving Iraq. *See* Dismissal Order p. 14, Doc. 127. However, as was specifically stated by this Court on page twelve of its Order while summarizing the Seventh Circuit's holding in *Indianapolis Colts, Inc. v. Metro Baltimore Football Club*, 34 F.3d 410 (7th Cir. 1994):

> [The Seventh Circuit] found that because the bulk of the Indianapolis Colts' most loyal fans reside in Indiana, the defendants knew that the largest concentration of consumers **likely** to be confused by the implicit affiliation would be in Indiana. [3]

*See* Dismissal Order p. 12, Doc. No. 127.  Defendants' assertion that Plaintiffs were somehow negligent by way of their argument that Defendants knew it was *likely* that members of the Indiana National Guard would return to Indiana upon leaving Iraq is especially unfounded in light of the fact that this Court is to resolve all factual disputes in Plaintiffs' favor.  *See Purdue Research Found. v. Sanofi-Syntholabo S.A.*, 338 F.3d 773, 782 (7th Cir. 2003).

The second basis for this Court's rejection of Plaintiffs' reliance upon *Calder* is its conclusion that Defendants targeted all individuals passing through Qarmat Ali rather than just Plaintiffs.  *See* Dismissal Order p. 14, Doc. 127.  Pursuant to Plaintiffs' theory of jurisdiction, however, Defendants were only submitting to jurisdiction in forums wherein Defendants knew it was likely that a victim would return after leaving Iraq.  With this qualification, to Plaintiffs' knowledge, this Court's Opinion is the first opinion that recognizes that it is a defense to an assertion of *Calder* jurisdiction that Defendants were knowingly directing injuries at multiple victims who live in multiple jurisdictions rather than at a single victim living in a single jurisdiction.  Stated differently, Plaintiffs do not believe *Calder* would have been decided any differently had, instead of directing defamatory

---

[3] The Seventh Circuit use of "likely" is faithful to *Calder*, as a defendant will never know with certainty that its actions will cause injury in a particular jurisdiction—the victim in *Calder* could have moved, Judge Easterbrook's proverbial bomb could have been lost in the mail, and the company in *Janmark* could have relocated; in each instance, a defendant only knows that it is likely that it is directing an injury into a forum.

remarks toward one individual living in Florida, *The Enquirer* indiscriminately made defamatory remarks directed at every head basketball coach with a team in the NCAA National Championship Tournament with the corresponding knowledge that each head coach resided in the state of the school he coached.

Again, Plaintiffs make these assertions to demonstrate that Plaintiffs' jurisdictional theory was not unreasonable. Plaintiffs can and have accepted the opinion of this Court; Plaintiffs cannot and should not accept the characterization of their theory of jurisdiction as negligent.[4]

### B. *Indiana Code section 34-52-1-1(b) does not Support Defendants' Prayer for Attorney's Fees*

To add insult to injury, having prevailed in their claim that Indiana does not have a sufficient relationship with this dispute to exercise personal jurisdiction over Defendants, Defendants now assert that Indiana has a sufficient relationship with this litigation to render Indiana law applicable. *See* Defs' Br. in Supp. at 2, 4. Defendants' reliance upon Indiana Code section 34-52-1-1(b) is, necessarily, either in contravention of this Court's holding that Indiana does not have sufficient contacts with this dispute to exercise personal jurisdiction over Defendants or is in contravention of the *Erie* doctrine.

---

[4] With regard to Plaintiffs' theory of general jurisdiction—though not extremely negligent under any circumstance—it was necessary for Plaintiffs to maintain this theory in the event that Plaintiffs discovered Defendants were disingenuous in their discovery responses and had significant forum contacts with Indiana—as the maintenance of a general jurisdiction allegation provided Plaintiffs with a ready vehicle to make use of such facts should they arise. In light of Defendants' above-cited discovery tactics, Plaintiffs' maintenance of their theory of general jurisdiction largely premised upon the possibility that Plaintiffs might discover forum contacts not disclosed by Defendants cannot be said to be ill founded.

Under the *Erie* doctrine, a federal court sitting in diversity—such as this Court—applies state substantive law and federal procedural law to the litigation. *See First Nat'l Bank & Trust Corp. v. Am. Eurocopter Corp.*, 378 F.3d 682, 689 (7th Cir. 2004) (citing *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 754 (7th Cir. 2004)). Thus, if Indiana Code section 34-52-1-1(b) is a procedural provision, this Court may not apply it pursuant to the *Erie* doctrine. Conversely, if Indiana Code section 34-52-1-1(b) is a substantive law, this Court has already, in effect, determined that Indiana law is inapplicable to this litigation by way of its conclusion that Indiana does not have a sufficient relationship to this dispute to give rise to jurisdiction. Under either circumstance, Indiana Code section 34-52-1-1(b) is not applicable to this litigation.

Furthermore, even if Indiana Code section 34-52-1-1(b) were applicable to this litigation—and it is not—for the same reasons Plaintiffs' conduct does not trigger a right to attorney's fees pursuant to 28 U.S.C. section 1927, Plaintiffs' conduct was not "frivolous, unreasonable, or groundless" as defined by Indiana Code section 34-52-1-1(b). *See Madison Tool & Die, Inc. v. ZF Sachs Automotive Am., Inc.*, 2008 WL 767169 * 8 (S.D. Ind. 2008) (defining frivolous, groundless, and unreasonable). Rather, at the very most, Plaintiffs' theory of jurisdiction was "a good faith and rationale argument for an extension, modification, or reversal of existing law," which is expressly authorized by Indiana law. *See Madison Tool & Die, Inc.*, 2008 WL 767169 * 8.

C.  *This Court's Inherent Authority does not Provide a Basis to Award Defendants Attorney's Fees*

Defendants lastly assert that they are entitled to an award of attorney's fees premised upon this Court's inherent power to impose sanctions.  Defs' Br. in Supp. at 4.  The inherent authority of this Court to sanction, however, "is a residual authority, to be exercised sparingly" and, thus, is not a power that is used to lower the factual showing required of a party to obtain an award of attorney's fees.  *Dal Pozzo v. Basic Mach. Co., Inc.*, 463 F.3d 609, 614 (7th Cir. 2006).  As Plaintiffs' theory of personal jurisdiction was neither negligent, groundless, unreasonable, nor frivolous, Plaintiffs' theory does not provide a basis for invoking this Court's inherent authority to sanction.

D.  *Defendants' Forum Shopping Allegations are Baseless*

In support of their prayer for attorney's fees, Defendants also accuse Plaintiffs of forum shopping by way of Plaintiffs' decision to file in Indiana rather than in Defendants' home state of Texas.  *See* Defs' Mot. in Supp. at 7-8.  In presenting this argument, Defendants fail to define forum shopping or cite to any legal authority in support of their assertions.  Had Defendants consulted case law, however, they would have realized that filing in Texas would have actually been more consistent with forum shopping than filing in Indiana and that forum shopping is typically deemed improper when a Plaintiff files two *simultaneous* suits rather than favors one jurisdiction over another.  *State Farm Fire & Cas. Co. v. Jenkins*, 2009 WL 529083 * 6 (D. Hawaii 2009); *Rambaran v. Park Square Enters.,*

*Inc.*, 2008 WL 4371356 * 6 (M.D. Fla. 2008).   As stated by *Terra Securities ASA Komkursbo v. Citigroup, Inc.*:

> Defendants correctly assert that a Plaintiffs' choice *of Defendants' home forum* over another forum where a defendant is amenable to suit and to which the plaintiff and the case are much more clearly connected, often suggests forum shopping.

2010 WL 546970 * 9 (S.D.N.Y. 2010) (emphasis added).

As Indiana is the state wherein Defendants knowingly directed Plaintiffs' injuries; is the state wherein those Plaintiffs who have not already died as a result of Defendants' conduct are forced to lie in bed at night wondering if they will meet the same fate as David Moore who died of interstitial lung disease in Indiana, Commander James Gentry who died of interstitial lung disease in Indiana, and a third Plaintiff who is currently hospitalized in Indiana with chronic nose bleeds; and is the state wherein Plaintiffs' health is monitored, Indiana has a greater connection to this litigation than Texas.  For all of these reasons, this Court should reject Defendants' unsupported allegation of forum shopping.

## IV.  Conclusion

For all of the above-stated reasons, this Court should sustain Plaintiffs' Objection to Defendants' Bill of Costs, strike Defendants' Bill of Costs, deny Defendants' Motion for Attorney's Fees, as well as provide Plaintiffs with any other relief it believes to be just and appropriate in the premises.

COHEN & MALAD, LLP

By:   /s/ Gabriel A. Hawkins
       David J. Cutshaw, Attorney No. 3997-49
       Gregory L. Laker, Attorney No. 10322-49
       Gabriel A. Hawkins, Attorney No. 23449-53

COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
Telephone:   317-636-2481
Facsimile:   317-636-2593

Of Counsel:
Michael Patrick Doyle, Tex. Bar No. 06095650
Jeffrey L. Raizner, Texas Bar No. 00784806
Patrick M. Dennis, Texas Bar No. 24045777

DOYLE RAIZNER LLP
One Houston Center
1221 McKinney Suite 4100
Houston, Texas 77010
Telephone:   713-571-1146
Facsimile:   713-571-1148

## CERTIFICATE OF SERVICE

I hereby certify that on March 25th, 2010, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Donald M. Snemis                        Jeffrey L. Raizner
Phillip R. Scaletta                     Michael Patrick Doyle
Seth M. Thomas                          Patrick M. Dennis
ICE MILLER LLP                          DOYLE RAIZNER LLP

donald.snemis@icemiller.com             jraizner@DoyleRaizner.com
phillip.scaletta@icemiller.com          mdoyle@DoyleRaizner.com
seth.thomas@icemiller.com               pdennis@DoyleRaizer.com

*Attorneys for Defendants KBR, Inc., et al*      *Attorneys for Plaintiffs*

M. Randall Jones
SERPE, JONES, ANDREWS,
CALLENDER & BELL, PLLC

rjones@serpejones.com

/s/ Gabriel A. Hawkins
Gabriel A. Hawkins

COHEN & MALAD, LLP
One Indiana Square
Suite 1400
Indianapolis, IN 46204
Telephone (317) 636-6481
Fax (317) 636-2593
Email: ghawkins@cohenandmalad.com